The petition of Harrison alleges that La Fruta is a station, having a station house, shed, water tank, a side track and a spur track, switches, etc.; that about 20 feet north of the north switch is a trestle 60 feet long, which trestle is railed and planked over, so that defendant's employés could use same in the performance of their duties; that defendant had no cattle guards at said trestle to keep stock from going thereon; that from said trestle northward defendant maintains fences upon each side of its right of way; that about 300 or 400 feet north of said trestle is another trestle, about 200 feet in length, and from 1 to 20 feet high, constructed of timbers, cross-ties, and tracks of the railway; that defendant maintains a cross fence across its right of way under each of said trestles, maintained for the purpose of keeping stock off its right of way thereon and thereat; that about April 19, 1911, during the nighttime, two of plaintiff's horses went over said planked trestle and upon defendant's track and right of way, and in and upon the other unplanked trestle, and fell off, or were thrown off, said trestle to the ground by defendant's train, and so injured that one had to be killed, and the other received a sprained shoulder and was badly bruised and injured, said horses being worth $150 each; that plaintiff has expended and agreed to expend $25 for medicine and medical attendance upon said horses, and has spent 20 days in caring for the horses, to his damage $40, and the live horse has been damaged $50; that it was the duty of defendant to erect, maintain, and keep in order suitable cattle guards or stops at and near the said north switch, and at the south end of said bridge, or at the south end of said long trestle, and to keep same in good repair.
As explanatory of plaintiff's case, the brief states:
"From the fact that there were fences along each side of the railroad right of way, and also cross fences across the right of way, one under the planked bridge, and one running across under the trestle, making a complete inclosure and trap, the only way for cattle or horses to get into this inclosure was to walk across the floored bridge; there being no cattle guards or stops to prevent them from so doing. The fences were in good repair along its right of way, and also the cross fences. There was no way for stock to get into said inclosure, except to walk across the bridge.
"The bridge was wide enough for five or six horses to be driven abreast across the bridge. It had railings three or four feet high on each side. Stock or animals could walk across this floored bridge the same as any wagon bridge; there being no cattle guard or stop at the end of said bridge to keep animals from getting into said inclosure or trap. There was no cattle guard or stop at the south end of the long trestle.
"After Harrison's horses crossed the bridge, they ran north along the railroad track onto the trestle. One horse went out about four feet and the other horse three bents (meaning 30 feet). There were marks on the ground on each side of the trestle where these horses struck the ground, some 10 or 12 feet below. There were prints of hoofs of the horses on the ties in the trestle, and also hair and hide; looked like they had been dragging. Mr. Harrison alleges in his petition `that the horses fell off, or were thrown off, of said trestle to the ground by one of appellant's trains.' One horse was *Page 597 
badly injured, and the other received a broken leg and had to be killed.
"J. D. Kring had worked for the railway company, and is familiar with the decked bridge and also the trestle at La Fruta, and on recross-examination says: `I know what a cattle guard is. I worked for this railroad in the capacity of a carpenter. I know what it takes to keep cattle out of the right of way in the shape of a cattle guard. In my opinion, I would say that ordinarily a cattle guard would be necessary in front of a trestle like that to keep the cattle from going across the trestle, when the inclosure is fenced on both sides.'"
Defendant pleaded exceptions and a general denial. A verdict for $150 was returned for the plaintiff.
The court, in its charge, set forth articles 4523, 4525, and 4527, and then told the jury that, "if it was the duty of defendant to maintain cattle guards or stops at the entrance of said inclosure or field, as set forth in plaintiff's petition, under the law, and if the jury find from the evidence in this case, under the rules of law I have just given you, that plaintiff's horses were injured by the failure of the defendant to construct and maintain proper cattle guards or stops at the entrance of the inclosure or field, as set forth in plaintiff's petition, and that such failure to maintain such cattle guards or stops, as aforesaid, was the proximate cause of the injuries complained of, then your verdict may be for the plaintiff. * * * If you find that there was no inclosure or field, as contemplated by the law just given to you, or if you find from the evidence that there was an inclosure or field, and further find that there was a cattle guard or stop, as provided by law, then your verdict should be for the defendant."
The court refused to give a peremptory instruction for the defendant, but gave charges requested by defendant and joined in by plaintiff, which were, in substance: (1) That if the horses were injured by reason of the condition of defendant's bridge, trestle, or premises, but were not injured by coming in contact with one of defendant's trains, or a part thereof, to find for defendant. (2) That the jury were not to allow plaintiff anything for loss of time in treating his horses, nor for expenses in treating the horses in excess of $25, nor for loss of services of the horse that survived.
We conclude, after considering the briefs: (1) The articles referred to in the charge had nothing to do with the case. (2) There was no duty imposed by law on the defendant to construct a cattle guard to keep straying animals from getting upon its track at this place; and it had a perfect right to not have cattle guards or stops there.
To the extent it left the way open, defendant had its track unfenced at that place, and, under our statute, was liable absolutely for injury to animals going upon its track, if injured by contact with its trains. If not injured in that way, defendant would be liable only upon proof of some negligence on the part of defendant causing them injury.
The testimony is insufficient, in our judgment, to show that these horses were injured by contact with a train. The inclosure under and between the trestles does not appear, from any testimony, to have been the cause of the injuries these horses sustained. In fact, one of the requested charges, concurred in by the plaintiff, eliminated this issue, and all issues, except whether or not the animals were struck by one of defendant's trains. Under the testimony in this case, it is clear that that was the only theory of liability that could be claimed.
Plaintiff's testimony was as follows: "I made an investigation as to how my horses had gotten to this inclosure. I could see the tracks along the railroad bed. I saw the tracks probably 100 yards, and maybe more, south of the north trestle. The tracks appeared to me as if they had been running. I went up on top of the trestle that morning. I found where the horses had been up there. There was hair and blood there. They were all skinned up; one of them with a broken leg. I found hoof marks on the trestle. * * * The marks of the horses that I found there indicated that they were running north. They ran on the trestle, one of them went out about four feet and the other one three bents, going north. * * * I saw marks of where the horses' legs had slipped through between the ties on the trestle and skinned themselves on the edges of the ties. * * * There were marks of where the horses had struggled with their hoofs to get back on the ties."
The witness Sparks testified: "I saw Mr. Harrison's horses when I arrived that morning. Two of the horses I saw were injured. One of them had its leg broken just above the knee joint, right at the knee joint, and was partly skinned up on its legs; you could hardly tell the break from the joint. The other one had no hurt. I could only see skinned places on its legs; but it was so stiff in its shoulder that it could hardly walk. It just dragged one of its fore feet all the time." This witness also testified that he and Mr. Harrison went up to the long trestle that morning; that he could see the prints of hoofs of horses where they had been on the ties; looked like they had been dragging and left the signs of their hoofs there, and there was a considerable amount of hair on the cross-ties. There was other similar testimony in behalf of plaintiff.
Not one of plaintiff's witnesses testified that the animals had any marks on them indicating that they had been struck by a train. On the contrary, the section foreman testified that the next morning he saw the animals in Mr. Harrison's lot, and Harrison *Page 598 
claimed they had been hurt by being run into a railroad bridge. This was not contradicted by Harrison. This witness testified, also, that he had seen plenty of animals that had been struck by a train, and it was a part of his business to pull them off of the track, if they were in the way; that he generally knew the effect of an animal being struck by a train; that he did not think that these animals were struck by a train. They did not have the marks of a train on them. It appears that only two trains passed La Fruta that night, and the engineers of both testified they did not run into any animals on that trestle.
The case should have been submitted on the question whether or not the animals were caused to fall from the trestle by being struck by a train of defendant's, and on no other.
The testimony may be more fully developed on this issue upon another trial. We are not willing to sustain such a finding on the testimony before us. Even if the testimony on this point were sufficient to leave an inference that the horses received their injury from being struck by a train, we would have to reverse this judgment on account of the erroneous and misleading instruction contained in the main charge of the court.
Reversed and remanded.